

3200 N. Central Avenue, Suite 2250
Phoenix, Arizona 85012
T: (602) 280-1000; F: (602) 265-1495
Shaheen P. Torgoley, AZ State Bar No. 024791
STorgoley@rrpklaw.com
Christopher T. Rapp, AZ State Bar No. 013374
CTRapp@rrpklaw.com
*Attorneys for Defendant Ali Joseph*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| United States of America, | Case No. CR-22-01070-PHX-DJH |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| Ali Joseph, | |
| Defendants. | |

### I. SUMMARY

Mr. Joseph is a 44-year old father of two with no prior criminal convictions. His former marriage—which was arranged between families of a common Iraqi ethnic group—produced two daughters, but failed to survive the cultural transition to life in the United States. After the marriage ended, the relationship between Mr. Joseph and his ex-wife worsened when they could not agree on child custody. Mr. Joseph was devastated by the family court's eventual ruling, which he received at the same time he learned his father was growing progressively more ill. He faced this hurt by relying in part on a relationship of the least sincere kind: an FBI informant who had already befriended Mr. Joseph in the hope of convincing Mr. Joseph to support ISIS.

A real friend would have tried to turn Mr. Joseph away from desperate solutions and provide moral guidance. But the informant—a professional actor—did the opposite.

The informant pivoted from the terrorism trap to the murder trap. When the informant could not convince Mr. Joseph to provide material support to terrorists, he assured Mr. Joseph he had experience facilitating assassinations using a hitman from out of state. This supposed hitman was an undercover agent who agreed to kill Mr. Joseph's ex-wife for the bargain price of only $3,000. Mr. Joseph's crime here—and it *was* a crime—was agreeing with the plan the government's agents fomented.

Mr. Joseph should have resisted the informant's illegal and immoral proposals. This difficult period in Mr. Joseph's life took him to an unacceptable place. While this case does not satisfy an entrapment defense, it begs for a more nuanced view of criminal culpability. Mr. Joseph has never been charged with a crime of violence, and he was not searching for a hitman. The government was already *deep* in Mr. Joseph's life pursuing one ruse when it shifted to a second, to offer a permanent solution to Mr. Joseph's custody woes.

A sentence of 24 months matches what a defendant has received for the same conviction in a prior case. In any event, the government's recommended sentence of 102 months exceeds any recent example of a solicitation conviction, which in Arizona and corresponding districts range from 24 to 90 months.

24 months is sufficient but not greater than necessary to satisfy the interests in 18 U.S.C. § 3553.

## II. MR. JOSEPH'S LONG AND DIFFICULT PATH TO AMERICA

Mr. Ali has Iraqi ancestry but was born in Kuwait in the late 1970s, where his family had fled to escape persecution. In the late 1960s the Ba'ath Party, a quasi-secular group, gained control of Iraq. During the 1970s, the Ba'athists began to purge political opponents fueled by the strength of an Arab Nationalist population of Sunni Arabs through central and northern Iraq. Mr. Joseph's family were Shiite Muslims from Basra, Iraq, far from the Ba'ath power base in Baghdad, and supported a democratic form of government. Mr. Joseph's father headed one of many families who, having been outed

as a rival of Ba'ath, fled Iraq for Kuwait, another majority Sunni nation, in 1975. By 1979, Saddam Hussein controlled every lever of power in Iraq and the Ba'ath Party. Mr. Joseph's family yearned to live quietly and peacefully in Kuwait.

After the Iranian Revolution of 1979 and Iraq's perceived threat that the revolution could replicate there, the situation became unsafe for Mr. Joseph's father (and similarly situated) in Kuwait. Kuwait also viewed the Iranian Revolution with distrust and increased domestic and foreign cooperation with Saddam Hussein. Mr. Joseph was born in Kuwait and still an infant when his father again fled a rising threat level, this time to Ahvaz, Iran, 130 miles (and an international border) from Basra. In Ahvaz, Shiites lived peacefully even if of Arab descent and speaking Arabic. Mr. Joseph eventually learned to speak Farsi.

The peace Mr. Joseph's family found would prove short-lived. Within two years of their arrival to Ahvaz, Saddam Hussein directed Iraq's army to invade Iran, not far from where the family lived. Mr. Joseph spent his formative years on the front line of this war zone. The conflict—remarkable for its utter bloodiness and massive casualty numbers—ended in 1988. Some estimates place the dead at 500,000 Iraqis and 750,000 Iranians, along with millions wounded.

Mr. Joseph and his family remained in post-war Iran through early 1990s. Mr. Joseph's father probed a possible return to post war Iraq, and was associated a man named Ahmed Chalabi, an Iraqi Shiite and MIT and University of Chicago-educated mathematician. Mr. Chalabi grew a movement of Iraqi exiles who sought regime change in Iraq. By the mid-1990s, Mr. Chalabi was receiving significant support both from the CIA and the Clinton Administration. Consequently, the Ba'ath Party renewed its targeting of political opponents domestically and abroad. In the mid-1990s, the Ba'ath regime began to exchange POWs and political targets with Iran. During this period of horse trading, Mr. Joseph's father learned that their welcome in Iran was

running out. They fled, again, now to Syria. Under Hafiz al-Assad—Bashar's father—Syria was home to many prior waves of Iraqi refugees.

Mr. Joseph and his family lived in Syria from 1996-1999. He finished high school there. In 1999, Syrian relations with the United States remained relatively healthy, particularly given Syria's earlier cooperation in the Gulf War against Saddam Hussein. Mr. Joseph's family were stateless refugee seekers, and his father successfully obtained asylum for the family in the United States. They moved to Arizona in hopes of finding a peaceful, permanent home.

In Arizona, Mr. Joseph completed studies through the Phoenix Job Corps, where he concentrated on English Second Language and Electronics Assembly. Mr. Joseph then worked for a company who contracted with Cox Communications. Mr. Joseph worked in cable installation and repair until the company folded around 2007-2008.

Around 2008, Mr. Joseph's extended family in Basra introduced him to A.A. (*i.e.* the victim in this charge), whose family was a member the same ethnic group as his. Mr. Joseph, a deeply religious man, was attracted to A.A.'s common cultural values and piety. In 2008, Mr. Joseph obtained immigration status and a Green card for A.A. They were married in Basra and settled in Phoenix in 2010. to Basra for their wedding. Mr. Joseph even "converted" from Shia to Sunni Islam for A.A. In 2014, Mr. Joseph enrolled in the Alpha Pacific Film Institute, where he studied video production. He worked in security while also creating video pieces for small businesses.

Mr. Joseph and A.A.'s marriage began to disintegrate. Mr. Joseph remained devout while A.A. became progressively more secular. This divergence became a critical issue in both their lifestyles and attitude toward rearing their children. Their disputes escalated, on several occasions, to the point where one or the other called police, although neither party has been convicted of domestic violence charges.

A.A. and Mr. Joseph divorced in 2020. After the divorce, the couple became locked in an intractable custody battle. The offense conduct in the present case arose

4

after a Family Court awarded shared child custody to both parents over Mr. Joseph's objection. Unfortunately, Mr. Joseph's father died in late August 2022, while Mr. Joseph awaited a detention hearing in the present matter. Mr. Joseph's mother, siblings, daughters, and nephews/nieces live in Arizona.

### III.   Mr. Joseph's Physical and Mental Health

Mr. Joseph is 44 years old. He suffers from an enlarged prostate, which makes bladder voiding an often-impossible task. Mr. Joseph has previously been medicated for the condition and will likely consider a surgical option in the future. He is hypoglycemic and must monitor his blood sugar levels. Since the inception of this charge, he has been taking psychological medications for anxiety and depression.

During the pendency of the FBI's prolonged investigation, Mr. Joseph's mother has suffered from heart/potassium related health scares, and his father passed away from his extended illness in August 2022.

#### A. Mr. Joseph's Behavior While Detained

Mr. Joseph has been detained 606 days as of this brief's filing date. During this time, Mr. Joseph reports no compliance issues at Central Arizona Detention Center in Florence, Arizona. He reports remaining a classification of zero, the lowest available.

#### B. The Presentence Report ("PSR") and Plea Agreement

Mr. Joseph lodged objections to the draft PSR, under seal, in mid-February 2024. As of this filing, undersigned counsel has not received a final PSR. Apart from background information, the chief objection relates to which Guidelines chapter should apply to a conviction for Solicitation to Commit Murder for Hire.

By stipulation under Rule 11(c)(1)(C), the parties agree that the maximum sentence imposed will be either 102 months or 87 months, depending on which Guidelines chapter the Court determines appropriate.

### IV. APPLICATION OF 3553 FACTORS WARRANTS A DOWNWARD VARIANCE

**A. Ali Joseph's Lack of Criminal History**

At 44 years old, Mr. Joseph has no prior criminal convictions. He has not led a life of crime. He arrived in the United States as a refugee having never lived in his own home country. He was born to parents who had fled their homeland and who wished to escape political persecution. Their welcome did not last long in Kuwait based on that country's erstwhile cooperation with Saddam Hussein, and so they moved to Iran. Within two years, their newest home saw the bloodiest war since World War II, with well over a million deaths and several million maimed, gassed, and forever scarred. This battle zone is where Mr. Joseph spent much of his childhood. During a long postwar rebuild in Iran—a country where Arabs like Mr. Joseph were, at most, tolerated—Mr. Joseph was again forced to flee. Then in Syria, where he lived several years, his family remained outsiders, seeking a safer haven. Finally he was granted asylum in the United States in 1999.

Mr. Joseph was never able to know true stability as child or adolescent. He could not live where his culture, tribal ancestry, and identity were commonly accepted by fellow countrymen. His alienation extended to his visits to Basra where he has never lived and has no shared experience with the local population. Even in the United States, Mr. Joseph experienced an extended period of adaption as he learned yet another new language and culture.

**B. Mr. Joseph is a pious man who holds strong religious and spiritual values.**

The consistent guiding principle in Mr. Joseph's formative years was his faith, regardless of where he lived. It is his stability. He has been a devout Muslim since birth. He remains a pious and practicing Muslim today.

Marriage is encouraged in Islam as a traditional family is viewed as the cornerstone of society. Relatedly, Mr. Joseph's desire to marry A.A. was driven in

6

significant part by their shared faith and desire to start a family. After A.A. settled in the United States, her religious values did not just change but disappeared. By then they shared two daughters. Mr. Joseph felt hurt. Fairly or unfairly, Mr. Joseph also felt deceived.

Divorce, under Sharia principles, was of course discouraged but occurred in three stages, with the first two revocable if the parties worked through problems. The divorce process in a nation of laws, as in the United States, represents a level of finality and legal structure which mid-life immigrants like Mr. Joseph often struggle to adapt. Though they eventually divorced, dissolution of marriage is uncommon in Mr. Joseph's culture and faith.

**C. While Mr. Joseph was not Entrapped, the Discussion of Murder for Hire was Fortified, Amplified, and Prolonged by the FBI's Informant as Part of an Uncommonly Long Ruse.**

Mr. Joseph lives for his daughters. After his divorce, and while he fought for child custody in family court, Mr. Joseph would have benefitted from mental health treatment, therapy, and good counsel. These resources existed. Even his ex-wife repeatedly told State and Federal authorities that Mr. Joseph had mental health issues. But the FBI had other plans. During the progression of the custody battle, A.A.'s incentive to instigate an investigation into Mr. Joseph increased.

In December 2019, Mr. Joseph initiated the divorce. In July 2020, while the dissolution proceedings were ongoing, A.A. told the FBI that Mr. Joseph was "crazy" but said—importantly—that she "was not sure" if he held extremist views. Discovery Bates 254-55.

Suddenly, after their next family court proceeding in August 2020, A.A. took a flamethrower to Mr. Joseph's character. To the FBI, she suddenly and repeatedly characterized Mr. Joseph as an extremist. She even recalled, this time, that Mr. Joseph was *so* extreme as to join a terrorist organization. So began the FBI's commitment of

7

multiple years of time and resources into investigating Mr. Joseph. Discovery Bates 257-59.

In November 2021, after their daughters were sent home from school with untreated lice and eczema while in A.A.'s custody, Mr. Joseph reported his ex-wife to authorities for neglecting their children. Yet the FBI again took this opportunity to speak only to A.A. She spun the child neglect allegation to impute ill motive to Mr. Joseph, who she asserted invented (despite a school nurse's report) the neglect in order to get full custody of their daughters. During this third, uncritical interview by the FBI, A.A. pushed the extremist narrative further still. She added that Mr. Joseph was crazy and fanatically religious. Discovery Bates 260-61.

A.A. even stopped former PPD officers—while she was out shopping at the Biltmore in March 2021—to remind them that Mr. Joseph was "crazy." Discovery Bates 262. She described Mr. Joseph as increasingly paranoid and feeling worried about the local community speaking (negatively) about him. *Id*.

The FBI decided to investigate Mr. Joseph. It introduced a professional (paid) informant to Mr. Joseph in April 2021. The FBI selected this informant because he shared cultural and religious origins with Mr. Joseph; the informant spoke Arabic; and the informant was able to quickly gain Mr. Joseph's trust. The FBI and informant used a failsafe tactic to fast-track a friendship: paying Mr. Joseph. The informant pretended the money was for Mr. Joseph to create inane videos of Arizona.

The informant befriended and maintained a friendship with Mr. Joseph incessantly over the next 16 months: they hung out on 18 distinct occasions, commonly in Mr. Joseph's home; spoke on the call at least 40 times; and traded hundreds of text messages. The informant told countless lies during the fake friendship the FBI drummed up, all meant to put Mr. Joseph at ease and incriminate himself. The informant routinely used terms of endearment to address Mr. Joseph and honorifics for his parents. The informant commonly invoked God and used spiritual terms consistent with Mr.

8

Joseph's faith. With this full-court press, the informant quickly gained Mr. Joseph's trust.

In addition to the videos commissioned by the informant, Mr. Joseph shared video clips he made about esoteric political topics throughout the Middle East. For instance, Mr. Joseph showed a video wherein he touted an Arab uprising in Ahvaz against the Iranian government. Mr. Joseph complained that the uprising not adequately covered in Arab Media. Discovery Bates 21340. When the informant tried to insert ISIS into the conversation, Mr. Joseph demurred and claimed that group was neutral on the Ahvaz issue.

During subsequent conversations in July 2021, the informant repeatedly attempted to steer Mr. Joseph's observations about an Ahvaz uprising (by a group called the Ahwazi Democratic Popular Front) toward discussions about ISIS. Mr. Joseph did not take the bait.

In May 2022, while the informant repeatedly attempted to turn Mr. Joseph more extreme in his views, Mr. Joseph mused that if A.A. was involved in a traffic accident their custody battle would end. In June 2022, while Mr. Joseph discussed his father's health problems, the informant attempted to broach the custody dispute after Mr. Joseph said efforts at using their families in Iraq to resolve the issue were fruitless. The informant said he would help Mr. Joseph, suggestively, "with whatever was needed."

In July 2022 while the informant hung out with Mr. Joseph, the informant asked about the child custody battle and learned that Mr. Joseph prayed that A.A. would get into an accident or fight with someone. When Mr. Joseph asked if it would be possible to convince A.A.'s father in Iraq to solve this issue by holding her father against his will, the informant said he would have to check to see if he could arrange that. The informant then said, on the topic of killing A.A., he had trustworthy people and would look into it, to include the cost. Mr. Joseph emphasized that kidnapping A.A.'s father would be preferred over killing anyone. The informant said he would look into both as both were

options. The *informant* even said that "the children will end up bad with [A.A.]," as any good friend would do to show support and loyalty.

It was the informant, in mid-July 2022, who used WhatsApp to continue the dialogue about a murder for hire. The informant said the hitman is ready. Of import, Mr. Joseph responded to the message but, according to the informant, deleted the response prior to the informant being able to see it.

On August 2, 2022, the informant contacted Mr. Joseph to determine whether Mr. Joseph lost partial custody during family court proceedings. The informant reminded Mr. Joseph that the informant could the people to kill A.A.

The informant *again* called Mr. Joseph four days later. Mr. Joseph was emotional, having recently learned that his father, whom he looked up to his entire life, was likely dying. Mr. Joseph claimed his life was falling apart and asked the informant what to do about child custody if the informant's murder plan failed. Quite tellingly, Mr. Joseph asked what they should do "…if this thing *you* told *me* about does not work." Mr. Joseph believed this plan to be the informant's plan. The informant assured Mr. Joseph it would not fail.

On August 14, 2022, the informant contacted Mr. Joseph to claim the informant spoke with the hitman. The informant then visited Mr. Joseph in person the next day. The informant asked Mr. Joseph how much Mr. Joseph had allocated to paying the hitman. The informant claimed he know how to "facilitate matters." The informant then called an undercover agent to push the ruse further. In Mr. Joseph's presence, the agent pretended to be a hitman and agreed to the paltry price of $3,000 to kill A.A., which the informant had discussed with Mr. Joseph prior to the call. The agent claimed that he would do it given his history with the informant, a statement designed to reassure Mr. Joseph.

**D. Defendants convicted of similar conduct within the District of Arizona and adjacent districts received sentences ranging from 24 to 90 months.**

A 24-month sentence followed by 36 months of supervised release is sufficient, but not greater than necessary, to satisfy the goals of 18 U.S.C. §3553. There is precedent for a sentence of this length for this charge.

Conversely, the government's recommended sentence of 102 months is unduly punitive. To illustrate the inappropriateness of such a term, both the government and probation's recommended sentences, a review of the following defendants' sentences is illustrative:

**CHART 1**

| Year | Dist. | Defendant | Charges | Sentence |
|---|---|---|---|---|
| 2021 | AZ | Zachary Lance Harvill 19CR148 | Murder for Hire (and Drug Trafficking Charges) | 87 months following a guilty plea |
| 2015 | NM | Cody Guss 14CR1364 | Murder for Hire | 24 months following guilty plea |
| 2020 | NM | Jacob Grijalva 19CR2748 | Obstruction of Justice and Murder for Hire | 108 months following guilty plea |
| TBD | NM | 22CR1205 | Murder for Hire | TBD |
| 2018 | CDCA | David Phillips 17CR498 | Murder for Hire | 90 months following trial |
| 2019 | CDCA | Rasheeda Johnson Turner 17CR787 | Murder for Hire | 78 months following plea |
| 2022 | CDCA | Scott Quinn Berkett 21CR292 | Murder for Hire | 60 months following plea |
| 2024 | CDCA | Julia Beth Coda 22CR474 | Murder for Hire | 57 months following plea |
| 2017 | SDCA | 16CR248 | Murder for Hire | 60 months following plea |

11

Undersigned counsel searched federal court records (*i.e.* Pacer) for the present statute of conviction in an effort to find these recent sentences. Excluding the highest and lowest terms, the middle terms tend to fall around 60 months. A few case assessments are illustrative:

1. Defendant Zachary Harvill, 28 years old, received an 87 month sentence in Arizona following an indictment for Murder for Hire; Manufacturing Controlled Substances; and Using or Maintaining Drug Premises. Mr. Harvill first sold 5,000 homemade prescription pills made a commercial grade pill press to an undercover DEA agent. During a later meeting, Mr. Harvill attempted to pay $6,000 for the agent to arrange killing someone who owed Mr. Harvill money. The plea agreement stipulated to a maximum sentence of 96 months, and the Court imposed a sentence of 87 months. In short, an active drug trafficker tried to hire a hitman to kill someone over a debt. For this, a District of Arizona judge imposed an 87-month term. That is 15 months less than the government recommends here for Mr. Joseph.

2. Defendant Cody Guss, who had a history of significant drug abuse and mental health issues possibly (and possibly a TBI), attempted to hire a white supremacist hitman to kill his wife while they underwent marriage counseling. He received a 24-month sentence in the District of New Mexico.

3. Defendant David Phillips was convicted by jury of attempting to hire a hitman/codefendant to kill his former business partner, for which he received a 90-month in 2018. In 2020, his remaining sentence was converted to time served due to the pandemic and Mr. Phillips' renal disease.

4. Defendant Rasheeda Johnson was convicted by plea agreement of attempting to kill her ex-boyfriend in order to collect a life insurance payout for which she received 78 months. Of note, the government stipulated that the base offense level of 32 applies pursuant to U.S.S.G. § 2E1.4, whereas in Mr. Joseph's case the government argues for the application of the solicitation to commit a crime of violence Guidelines

chapter which, in 100% of convictions, produces an advisory range exceeding the statutory maximum sentence.

While it is undoubtedly difficult to find direct-comparison cases, the above survey shows an array of convictions in line with the present. Among them, several involve more egregious facts or charges. Yet those cases still see lower sentences than the government recommends here. If an 28-year old drug-trafficker who wants to kill a debtor receives 87 months in Arizona, it is difficult to comprehend why Mr. Joseph would receive more. Particularly given the yeomen's effort it took from the informant to steer 44-year-old Mr. Joseph—juggling significant life traumas—into seriously considering a murder for hire agreement.

In any event, the closest parallel comes from the District of New Mexico and the case of Cody Guss. There, Mr. Guss was suffering through personal mental health issues when meeting an informant who agreed to kill his estranged wife. Like Mr. Joseph, Mr. Guss pleaded guilty and accepted responsibility for what was—criminal history-wise—an aberration in behavior. A 24-month sentence for Mr. Joseph would be in line with 3553 factors for a struggling, middle-aged man who has no history of criminal activity and for whom it took a confluence of rare influences to be in violation of federal law.

**Conclusion**

There is a disturbing notion present and one the Court should consider when weighing Mr. Joseph's *mens rea*: what would most ordinary people do if, during trying emotional challenges, his or her trusted friend was actually a professional FBI informant hoping to build a case against them? What if the government, with its vast resources and trained agents, used culturally simpatico informants to behave as the devil on one's shoulder? That is not a far cry from how Mr. Joseph became involved in this murder for hire. And while the details do not rise to an entrapment defense, it also is not accounted for in the statutorily available penalties or the U.S. Sentencing Guidelines.

Mr. Joseph genuinely regrets that he engaged in this absurd plan. It was a shameful act that will not recur. But just punishment does not require 102 months in prison, as the government seeks. Mr. Joseph asks the Court to impose a term of 24 months followed by three years of supervised release.

RESPECTFULLY submitted this 21st day of April, 2024.

**RYAN RAPP PACHECO SORENSON PLC**
/s/ *Shaheen P. Torgoley*
Shaheen P. Torgoley
Christopher T. Rapp
*Attorneys for Ali Joseph*

**COPY** of the foregoing transmitted by ECF for filing this 21st day of April, 2024, to:

David Pimsner
Abbie Broughton Marsh
Christopher Brown
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, AZ 85004
Attorneys for Plaintiff

By: /s/ *Shaheen P.Torgoley*